IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JEAN M. KEAYS,

                                    Plaintiff,

        vs.                                        Civil Action No.
                                                   1:04-CV-863 (TJM/DEP)


COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.

_____

APPEARANCES:                           OF COUNSEL:

FOR PLAINTIFF:

JEAN M. KEAYS, *pro se*


FOR DEFENDANT:

HON. GLENN T. SUDDABY                  WILLIAM H. PEASE, ESQ.
United States Attorney                 Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York  13261-7198

OFFICE OF GENERAL COUNSEL              BARBARA L. SPIVAK, ESQ.
Social Security Administration         Chief Counsel, Region II
26 Federal Plaza
New York, New York 10278               TOMASINA DIGRIGOLI, ESQ.
                                       Senior Attorney
DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Jean M. Keays,[1] who claims to suffer from fibromyalgia, depression, and a sleep disorder, has commenced this proceeding to challenge the denial of her application for disability and supplemental security income ("SSI") Social Security benefits.  That denial was based upon the conclusion of the Administrative Law Judge ("ALJ") who decided the matter at the agency level that plaintiff was not disabled at the critical times since she retained the residual functional capacity to perform both her past relevant work and entry-level jobs at all exertional levels.

Having reviewed the record, though without the benefit of a brief illuminating the arguments in support of plaintiff's judicial challenge to the Commissioner's determination, I find that the determination of no disability resulted from the application of proper legal principles, and is supported by substantial evidence.

I.    BACKGROUND

Plaintiff was born on May 20, 1974; at the time of the administrative hearing in this matter, she was twenty-nine years old.  Administrative

---

[1]    Plaintiff's name was Jean Ball at the time her applications for Social Security benefits were filed.  She has since reverted to using her maiden name of Keays, however, due to an intervening divorce.

2

Transcript (Dkt. No. 9) at pp. 15, 20.[2]  Plaintiff graduated from high school,

AT 282, and thereafter held various employment positions from 1987 until

July 7, 2001, when she became unable to work because of her illnesses.

AT 45, 60.  In the past plaintiff has worked as a cashier in a retail store, a

department manager in a craft store, an assistant manager in a toy store,

and a laundry attendant in a motel.  AT 60-64, 282.  According to the

plaintiff, each of those jobs involved standing and walking for most of the

day, and required her to lift up to forty or fifty pounds.  AT 61-64.

Plaintiff asserts that she suffers from fibromyalgia, a condition which

causes her pain, fatigue, and memory loss.  AT 45.  Since December 26,

1999 plaintiff has complained of headaches described by her as constant,

producing pain which varies in character from stabbing to excruciating,

depending on the day, sometimes spreading into her neck and shoulders.

AT 76.  Plaintiff additionally claims to suffer from vomiting, dizziness,

blurred vision, a sleep disorder, and an underactive thyroid.  AT 282, 288.

Plaintiff also states that she suffers from depression and anxiety, although

at the time of the hearing she was not seeing a psychiatrist or

---

[2]    Portions of the Administrative Transcript of evidence and proceedings before the agency, Dkt. No. 9, filed by the Commissioner together with her answer, will be cited as "AT _____".

psychologist for either condition.  AT 292.  According to the plaintiff, on or about mid-2003 she suffered a grand mal seizure, characterized by her as an isolated event.  AT 289-90.

Plaintiff takes a number of prescription medications, including, Zoloft, for depression; Zyprexa, for anxiety and sleep disorder; Clonazepam, for her sleep disorder; Cyclobenzaprine, for muscle tension; Synthroid, for her underactive thyroid; Topamax, for seizures; and Hydrocodine, for headaches.  AT 86-87, 288-89.  Plaintiff also takes over-the-counter pain relievers, including Tylenol and Advil, as needed.  AT 163-66.

The medical evidence in the record reveals that over the course of time, plaintiff has sought treatment from numerous sources.  Plaintiff was referred by her treating physician to Dr. Ranbir S. Dhillon, who she began seeing on January 22, 1999.  AT 98-99.  Dr. Dhillon reported that plaintiff's chief complaint was of headaches, which only occurred at night while asleep, and dissipated after five minutes.  *Id*.  His examination revealed that plaintiff's scalp and temporal arteries were not tender, and that her cervical and paraspinal muscles were neither tender nor tense.  *Id*.  Dr. Dhillon opined that plaintiff may suffer from tension headaches as a result

4

of a fragmented sleep pattern.  *Id.*  Based upon his evaluation Dr. Dhillon suggested that plaintiff undergo magnetic resonance imaging ("MRI") testing of her head, but did not recommend any treatment since her episodes did not last long enough for any medication to be effective.  *Id.*

In a follow-up appointment with Dr. Dhillon on February 8, 1999, plaintiff reported no change in her headaches.  AT 100.  The MRI testing, conducted on February 2, 1999, revealed a small pineal cyst, the clinical significance of which was unclear to Dr. Dhillon at the time.  AT 100, 112-13.  Although he expressed confidence the cyst was benign, Dr. Dhillon planned to consult with Dr. Stephen Saris to determine whether there was a need for further evaluation on the issue.  AT 100.  Dr. Dhillon also opined that plaintiff's birth control pills could be contributing to her headaches.  *Id.*

On February 12, 1999, Dr. Saris recorded his conclusion that plaintiff had a benign pineal cyst which was unlikely to cause her a problem in her lifetime.  AT 102.  Dr. Saris expressed to the plaintiff his confidence that the cyst was unrelated to her headaches, noting that her cranial nerve and limb examinations were normal, with the exception of a possible druzen in the medial right optic disc margin.  *Id.*

Plaintiff underwent a polysomnography study, conducted by Dr. Alice E. Bonitati on the evening of March 17 to March 18, 1999. AT 95-97. That testing revealed that plaintiff had mild obstructive sleep apnea and periodic leg movements, but it was not clear whether either condition could account for her symptomology. AT 95-96. Plaintiff's leg movements were determined not to be a cause of daytime sleepiness, and it was concluded that a diagnosis of narcolepsy was unlikely. AT 96-97.

Since the etiology of plaintiff's reported severe sharp headaches could not be determined from the initial testing, Dr. Bonitati decided to repeat the sleep study. AT 97. That second sleep study, conducted over May 3 to May 4, 1999, revealed periodic leg movement disorder and obstructive sleep apnea syndrome. AT 91-93. Although the study did not document any pathological or excessive sleepiness, Dr. Bonitati did note that plaintiff had subjective sleepiness with what appeared to be sufficient sleep. AT 93. Treatment for plaintiff's periodic leg movement disorder was also recommended. *Id.*

On July 29, 1999, Dr. Dhillon noted that plaintiff had a one year history of postural headaches that wake her up in the middle of the night, although he was still uncertain as to their cause. AT 103. Though noting

that it was theoretically possible, Dr. Dhillon considered it unlikely that the pineal cyst was causing plaintiff's headaches. *Id*. Dr. Dhillon reported that plaintiff was taking Clonazepam for her restless leg syndrome, and prescribed Midrin, as needed, prior to sleep. *Id.*

Additional MRI testing of the plaintiff was administered on February 16, 2000, again revealing a pineal cyst, producing minimal mass effect on the superior colliculi, but without definite signs of obstructive hydrocephalus. AT 151. Dr. Thomas I. Soule, a neurologist, examined the plaintiff on February 23, 2000 and concluded that while the MRI testing did reveal a benign, asymptomatic pineal cyst it was not very large and was not producing any of the plaintiff's symptoms, including the headaches that reportedly would wake her up from her sleep. AT158-59. Dr. Soule went on to opine that many of plaintiff's complaints could be explained on an ophthalmologic basis, and suggested she see a specialist for a thorough eye examination. AT 159. Dr. Soule recorded his impression as an incidental pineal cyst and a sleep disorder with excessive movements in sleep, and suggested an increase in plaintiff's dosage of Klonopin from 1 mg to 1.5 mg. *Id.*

On March 23, 2000, plaintiff underwent the suggested eye

examination.  AT 106.  Plaintiff's uncorrected visual acuity was determined to be 20/20-1 in each eye, and there was found to be minimal simple myopic refractive error without subjective acuity improvement.  *Id.*  The recorded impression of the examining opthamologist was that plaintiff's headaches were not refractive error in origin, nor was the pineal tumor affecting her visual system.  *Id.*

Records from the Health Center on Broad Street indicate that plaintiff was treated for groin and leg pain on March 21, 2000.  AT 181. Plaintiff was also treated for swelling of her right hand and a cyst on her left buttock on April 6 and April 12, 2000.  AT 182-83.

Dr. Soule again saw the plaintiff on April 20, 2000 in light of her recent complaints of pain in her left thigh and hip and swelling in her hands.  AT 152.  Dr. Soule noted that plaintiff did not have a clinical history that he would associate with multiple sclerosis, and accordingly concluded a spinal tap would not be diagnostically helpful.  AT 152.  Dr. Soule also reported that plaintiff's symptoms were vague and did not reflect a primary neurological disorder, except for the fact that she appeared to suffer from a sleep disturbance.  *Id.*

In May of 2000 plaintiff was referred to Dr. Seth W. Wharton, a

neurologist, for an examination.  AT 109-10.  Based on his examination,
Dr. Wharton reported that plaintiff showed no signs of dementia or
aphasia, her cranial nerves were intact, a motor examination showed
normal strength and tone, plaintiff's deep tendon reflexes were
symmetrical, and a sensory examination produced normal results.  AT
109-10.  Dr. Wharton opined that plaintiff might have "alarm clock
headache syndrome" and that she seemed depressed, prescribing Prozac
for her depression.  AT 110.

Plaintiff was seen by Dr. Fredric I. Fagelman, of North Country
Neurosurgical Associates, on July 26, 2000.  AT 115.  Based upon his
examination, Dr. Fagelman concluded that neurologically, everything
appeared normal.  AT 115.  Dr. Fagelman also reported uncertainty as to
whether plaintiff's pineal cyst was symptomatic, as well as with regard to
the source of her complaints.  *Id.*

A neurological examination conducted by Dr. Mark M. Souweidane,
on August 14, 2000 revealed no evidence of meningismus or focal
neurological deficit.  AT 117.  Dr. Souweidane's funduscopic examination
revealed no overt papilledema, and it was noted that the MRI from
February, 2000 had revealed a cyst on the pineal gland, with no

obstruction of the aqueduct and no hydrocephalus.  *Id.*  Dr. Souweidane also noted that there was no signal change in the remainder of the brain parenchyma, and no structural abnormality was recognized.  *Id.*  Dr. Souweidane assured the plaintiff that the pineal cyst did not have any radiographic criteria that would result in her current symptomology.  *Id.*

Upon referral from her physician, Dr. Vinodrai M. Parmar conducted a neurological examination of the plaintiff on September 1, 2000, in order to provide a second opinion regarding her headaches.  AT 163-66. Plaintiff reported to Dr. Parmar having experienced headaches beginning when she was a teenager, and becoming more frequent over the years, and that over-the-counter medications lessened their severity.  AT 163. Plaintiff further advised Dr. Parmar that beginning a few years prior, she experienced another bout of headaches which improved with the use of Klonopin.  *Id.*  According to the plaintiff her headaches were worse at night and early morning, but would improve when she got up and started "working around" them.  *Id.*  Plaintiff expressed having had concerns that she might have a brain tumor, but after seeing several neurologists, she accepted that the pineal cyst was an incidental finding and not related to her headaches.  *Id.*  Dr. Parmar reported that plaintiff's headaches appear

to have improved after the time of that realization.  *Id.*

In a report of his findings, Dr. Parmar noted a normal neurological examination and opined that plaintiff 's headaches were related to a disturbed sleep/wake cycle with muscle contraction headache.  AT 165.  Dr. Parmar also noted that migraines run in plaintiff's family, and that this could be a contributing factor.  *Id.*  Dr. Parmar further opined that plaintiff's tiredness, loss of energy, blurry vision, and other symptoms could be related to Klonopin, and suggested replacing it with Nortriptyline.  AT 165-66.  Dr. Parmar also prescribed Sinemet for plaintiff's restless leg syndrome, and advised her to use only up to three or four Advil doses daily, alternating with Tylenol every other day.  AT 166.

Dr. Parmar conducted a follow-up evaluation of the plaintiff on September 20, 2000.  AT 154.  On that occasion Dr. Parmar decreased her dosage of Nortriptyline and terminated her use of Sinemet, due to an increase in side effects, and returned her to Klonopin.  *Id.*  Dr. Parmar noted that based upon his neurological examination, he did not detect any change in plaintiff's condition.  *Id.*  To address plaintiff's concern that she could be suffering from a chronic infection as the cause of her headaches, Dr. Parmar recommended a spinal tap to rule out that possibility.  *Id.*

On January 2, 2001, Dr. Neil S. Lava conducted a neurological examination of the plaintiff.  AT 195-97.  Dr. Lava's findings from that examination were benign, and he was unable to identify any cause of plaintiff's reportedly chronic, daily migraines.  AT 197.  Dr. Lava recommended Depakote on a trial basis to help with plaintiff's headaches, with the expectation that if she did not derive any benefit from that medication, he would recommend admitting her into a hospital to try intravenous medications.[3]  AT 197.

Plaintiff was referred by Dr. Lava to Dr. Mark P. Dentinger, a headache specialist, on February 26, 2001.  AT 197, 199.  Dr. Dentinger reported that the plaintiff appeared concerned about her chronic headaches, and in his opinion considerably overestimated the pain which they cause her.  AT 199.  Dr. Dentinger recorded his impression as including "sudden onset headaches" and an augmentation of pain complaints.  *Id.*

In February of 2001, Dr. Stephen A. Monn examined the plaintiff and

---

[3]    Records from Albany Medical Center Hospital indicate that in February, 2001, plaintiff was admitted into that facility and treated with intravenous medication for five days.  AT 201.  Plaintiff reported a significant improvement in her headaches as a result of this treatment.  *Id.*

reported that she had periodic leg movement disorder that did not appear to be under control, despite the use of Klonopin.  AT 189-90.  Dr. Monn recommended that the plaintiff repeat polysomnographic/diagnostic testing.  AT 190.

Plaintiff underwent an all-night sleep study/polysomnography on the evening of April 18 and 19, 2001.  AT 191-94.  That study revealed no evidence of underlying obstructive sleep disordered breathing, and that plaintiff's sleep architecture was nearly normal, with plaintiff's sleep being disrupted with arousals largely associated with snoring and periodic leg activity.  AT 191.

Plaintiff was seen by Dr. Philip Gara, an internist, on July 22, 2001, August 20, 2001, September 7, 2001, and October 16, 2001.  AT 213-20. Based on plaintiff's chief complaint of constant headaches, Dr. Gara diagnosed her as suffering from fibromyalgia and chronic headaches.  AT 213, 215, 217.  In a letter dated November 14, 2001, Dr. Gara opined that plaintiff suffered from chronic fibromyalgia, chronic fatigue syndrome, and violent chronic headaches, and noted that previous neurological work-ups had proven fruitless and that, in his opinion, plaintiff was "totally disabled". AT 212.

Dr. Gara's office notes of visits by the plaintiff on January 18, 2002 and May 13, 2002 reiterate his diagnosis of chronic headaches, chronic fatigue, and fibromyalgia.[4]  AT 224, 230.  It is noted in those reports that while plaintiff reported muscle aches on both of those occasions, Dr. Gara's objective findings were normal, except for noting tenderness in the hip and shoulder girdle on January 18, 2002.  AT 225, 231.

In response to a request for medical advice, Dr. Carol Waxeley, a non-examining state agency physician, opined on July 17, 2002 that plaintiff did not exhibit the classic symptoms of fibromyalgia, and that the physical criteria for fibromyalgia and chronic fatigue syndrome had not been met in her case.  AT 241-42.  Dr. Waxeley also noted that plaintiff had undergone a thorough work-up, with no diagnosis, and that her mild sleep disturbances were likely not responsible for her symptoms.  AT 241.

In a physical residual functional capacity ("RFC") assessment dated July 18, 2002, a non-examining state agency physician, noting plaintiff's various complaints of pain and fatigue, nonetheless opined that her conditions impose no exertional, manipulative, visual or communicative

---

[4]    Dr. Gara treated plaintiff for a urinary tract infection on May 29, 2002.  There is no mention of headaches, fatigue or fibromyalgia in the notes of that visit.  AT 222-23.

limitations.  AT 243-50.  With the exception of the need to avoid hazards,

climbing, and balancing, the RFC also reflected no environmental or

postural limitations.  AT 245, 247.

Dr. Ralph L. Berry performed a psychiatric evaluation of the plaintiff

on August 18, 2003.  AT 254-55.  That examination revealed that the

patient was sad, constricted, and withdrawn, but nonetheless remained

alert and cooperative.  *Id.*  According to Dr. Berry, plaintiff possesses

average intelligence, her memory is intact, and her speech is normal and

smooth.  AT 255.  Plaintiff's insight and judgment were regarded as good,

and her symptoms were noted to include sleep problems, headaches, and

irritability.  *Id.*  Based upon her examination, Dr. Berry diagnosed plaintiff

as suffering from depression not otherwise specified ("NOS"), and

assigned a global assessment of functioning ("GAF") score of forty.[5]  AT

255.

A follow-up progress note, prepared by Dr. Berry on November 3,

2003, indicates that at that time plaintiff was still irritable, but improving.

_____

[5]    GAF is described as a "clinician's judgment of the individual's overall level of
functioning."  Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text
Revision 2000) ("DSM-IV-TR").  A score of 40 denotes some impairment in reality
testing or communication, or major impairment in several areas, such as work or
school, family relations, thinking, mood, or judgment.  *Id.* 34.

AT 260-63.  That report also noted that plaintiff is able to read one to two pages without intrusive, racing thoughts and her memory was intact.  AT 261.

During the administrative hearing conducted in this matter plaintiff was questioned regarding her daily activities.  In response plaintiff reported sleeping for nine to ten hours a night, but that she did not sleep well.  AT 283.  Plaintiff also testified that she weighed 165 pounds and had gained forty-five pounds over the past four years due to inactivity.  AT 283-84.  Plaintiff stated that headaches and fatigue keep her from shopping and completing household chores.  AT 285-86.  She claimed that she spends eighty percent of her days in bed, and generally is unable to function.  AT 291.  Plaintiff also testified that she sometimes gets her boyfriend's daughter off to school in the morning and takes care of her own personal needs, including combing her hair and dressing and bathing herself.  AT 287.

According to evidence in the record, plaintiff is a cigarette smoker, consuming approximately one pack of cigarettes daily.  AT 284.  Plaintiff testified that she has cut down to a half a pack a day, and that she does not have a problem with alcohol.  *Id*.

II.     PROCEDURAL HISTORY

A.     Proceedings Before The Agency

Plaintiff filed applications for disability and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("the Act"), respectively, on May 28, 2002, alleging a disability onset date of July 27, 2001.  AT 36-38, 270-72.  Those applications were denied on July 22, 2002.  AT 21-25, 273-77.

At plaintiff's request, a hearing was conducted before ALJ Joseph F. Gibbons on December 17, 2003 to address plaintiff's claim for benefits under the Act.  AT 27, 278-98.  At the hearing, plaintiff was represented by Linda B. Weller-Moon, who at the time was not an attorney.  AT 26.

_____On January 30, 2004, ALJ Gibbons issued a decision upholding the denial of benefits to the plaintiff.  AT 14-19.  In that decision, the ALJ employed the now-familiar, five step test for determining disability.  After concluding, at step one, that the plaintiff had not engaged in substantial gainful employment since July 27, 2001, AT 15, the ALJ went on to find that plaintiff suffers from impairments, including depression NOS, a sleep disorder, and chronic headaches, which significantly limit her physical or mental ability to perform basic work activities, but that those impairments,

either individually or in combination, were not sufficiently severe to meet or equal any of the listed, presumptively disabling impairments set forth in the regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 16.

In assessing the severity of plaintiff's alleged mental impairment, the ALJ employed the "technique" prescribed in the regulations, consisting of a two-part analysis.  AT 16.  The ALJ first considered the diagnostic characteristics of the impairment, and then assessed the functional limitations resulting from it.  *Id.*  ALJ Gibbons concluded that as a result of her impairment, plaintiff has no limitation in the area of daily living.  *Id.* While the ALJ discerned a slight limitation in maintaining social functioning, he found that plaintiff was not limited in maintaining concentration, persistence, or pace, and that there was also no evidence of episodes of decompensation or deterioration in work or work-like settings.  *Id.*

The ALJ next turned to assessment of plaintiff's RFC.  AT 17-18. After reviewing the evidence in the record, ALJ Gibbons found that plaintiff is capable of performing her past relevant work as a cashier in a retail store, a department manager in an art and craft store, an assistant manager in a toy store, and a laundry attendant in a motel, even though in

those positions she was required to lift up to fifty pounds and carried twenty-five pounds frequently.  AT 17.  The ALJ also concluded that because the plaintiff has no exertional limits, she retains the residual functional capacity to perform entry-level work at all exertional levels.  AT 18.

In light of the medical evidence in the record, and in particular the records of plaintiff's examining neurologists and the reports of the State agency physicians, ALJ Gibbons did not give Dr. Gara's opinion regarding plaintiff's disability controlling evidentiary weight because it is not supported by objective clinical and laboratory findings, and is inconsistent with other substantial evidence in the record, reflecting that the plaintiff has no exertional limitations.[6]  The ALJ also carefully considered plaintiff's testimony, but noted a number of significant inconsistencies.  AT 18.

Based upon his finding that plaintiff's symptoms were not a degree of severity, intensity, frequency, or duration to preclude her from performing her past relevant work, ALJ Gibbons determined that plaintiff was not disabled within the meaning of the Social Security Act.  AT 18.

---

[6]    In his decision, ALJ Gibbons actually states that Dr. Gara's opinion is "not inconsistent" with other substantial evidence in the record.  AT 17.  From the context of the sentence, however, it seems apparent that the ALJ did not intend to use a double negative when making this statement.

The ALJ's ruling became a final determination of the agency when, on

May 21, 2004, the Social Security Administration Appeals Council denied

plaintiff's request for review of that decision.  AT 4-6.

      B.   <u>This Action</u>

Plaintiff commenced this action on July 22, 2004.  Dkt. No. 1.  Issue

was thereafter joined by the Commissioner's filing on September 30, 2004

of an answer, accompanied by an administrative transcript of the evidence

and proceedings before the agency.  Dkt. Nos. 8, 9.

Plaintiff's failure to file a brief outlining the arguments in support of

her challenge to the agency's determination led to the issuance of an

order by me on February 7, 2005, directing the defendant to file a brief in

light of plaintiff's failure to do so.  Dkt. Nos. 10, 12, 13.  In view of the

submission of defendant's brief, and plaintiff's failure to file a

memorandum, the matter is now ripe for determination and has been

referred to me for the issuance of a report and recommendation, pursuant

to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(d).  *See also* Fed. R. Civ. P. 72(b).

III.   <u>DISCUSSION</u>

      A.   <u>Scope of Review</u>

_____A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp.2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, her decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 148.  If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)).  To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record.  *Id.*; *Martone*, 70 F. Supp. 2d at 148 (citing *Richardson*).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to

develop a full and fair record or to explain his or her reasoning. *Martone*,

70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.

1980)).  A remand pursuant to sentence six of section 405(g) is warranted

if new, non-cumulative evidence proffered to the district court should be

considered at the agency level. *See Lisa v. Secretary of Dep't of Health &*

*Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without

remand, while unusual, is appropriate when there is "persuasive proof of

disability" in the record and it would serve no useful purpose to remand

the matter for further proceedings before the agency. *Parker*, 626 F.2d at

235; *Simmons v. United States R.R. Retirement Bd.*, 982 F.2d 49, 57 (2d

Cir. 1992); *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638,

644 (2d Cir. 1983).

      B.     Disability Determination: The Five Step Evaluation Process

      The Social Security Act defines "disability" to include the "inability to

engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months[.] "  42 U.S.C. §

423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments
> [must be] of such severity that he is not only unable
> to do his previous work but cannot, considering his
> age, education, and work experience, engage in
> any other kind of substantial gainful work which
> exists in the national economy, regardless of
> whether such work exists in the immediate area in
> which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he
> applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be

employed in determining whether an individual is disabled. *See* 20 C.F.R.

§§ 404.1520, 416.920.  The first step requires a determination of whether

the claimant is engaging in substantial gainful activity; if so, then the

claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§

404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then

the second step involves an examination of whether the claimant has a

severe impairment or combination of impairments which significantly

restricts his or her physical or mental ability to perform basic work

activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer

from such an impairment, the agency must next determine whether it

meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.*

§§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so,

then the claimant is "presumptively disabled". *Martone*, 70 F. Supp. 2d at

149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20

C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an

assessment of whether the claimant's RFC precludes the performance of

his or her past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If it

is determined that it does, then as a final matter the agency must examine

whether the claimant can do any other work.  *Id.* §§ 404.1520(f),

416.920(f).

The burden of showing that the claimant cannot perform past work

lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996);

*Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it

becomes incumbent upon the agency to prove that the claimant is capable

of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that

burden has been met, the ALJ should consider the claimant's RFC, age,

education, past work experience, and transferability of skills.  *Ferraris*, 728

F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

    C.    <u>The Evidence In This Case</u>

        1.    <u>Plaintiff's RFC</u>

The lynchpin of the ALJ's determination of no disability is his finding that notwithstanding plaintiff's chronic headaches, sleep disorder, and depression, she retains the residual functional capacity to perform entry-level work at all exertional levels, and to perform her past relevant work. AT 17-18.  In order to uphold the Commissioner's determination, the court must therefore find that the ALJ's RFC assessment is supported by substantial evidence.

A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue.  20 C.F.R. § 404.1545(a).  An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis.  *Id.*; *Martone*, 70 F. Supp. 2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess plaintiff's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull.  20 C.F.R. § 404.1569a. Nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations, must also be considered. 20 C.F.R. § 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 §

200.00(e).  When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice. *Martone*, 70 F.Supp. 2d at 150 (citing *Ferraris*, 728 F.2d at 587).  An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F. Supp. 2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F.Supp. 300, 309-10 (E.D.N.Y. 1997).  In the present case, the ALJ's RFC findings are well supported by the medical evidence in the record.

Plaintiff has undergone extensive examination and testing by neurologists for her sleep disorder and headaches, with relatively benign results.  *See*, *e.g.*, AT 102 (Dr. Saris reporting that plaintiff's cranial nerve and limb examinations were normal), 115 (Dr. Fagelman reporting that neurologically everything appeared normal), 152 (Dr. Soule remarking that plaintiff's symptoms were vague and did not reflect a primary neurological disorder), 165 (Dr. Parmar reporting a normal neurological examination), 197 (Dr. Lava reporting a benign neurological examination).  Although MRI testing of plaintiff's brain has revealed a small pineal cyst, plaintiff's own

statement to the Appeals Council that the cyst was not related to her headaches, together with other, medical evidence in the record supporting this view, indicate that the cyst did not cause any functional limitations. AT 7, 112-13.  That position is supported by Dr. Dhillon, who has noted that the cyst is benign in nature, AT 100, and Dr. Saris, who has opined that the cyst was benign and unrelated to her headaches.  AT 102. Plaintiff's own treating physician, Dr. Soule, has similarly reported that plaintiff's cyst was benign and asymptomatic.  AT 158.  Dr. Souweidane also noted that the cyst did not have any radiographic criteria that would result in her current symptomology.  AT 117.  Moreover, an eye examination revealed that the cyst was not affecting plaintiff's visual system.  AT 106.

There is also substantial medical evidence indicating that plaintiff's sleep disorder does not prevent her from working.  Sleep studies conducted in 1999 could not determine the etiology of plaintiff's headaches or daytime sleepiness.  AT 91-93, 95-97.  The studies failed to document any pathological or excessive sleepiness, and revealed that a diagnosis of narcolepsy was unlikely.  *Id.*  Additionally, Dr. Carol Waxeley, non-examining state agency physician, noted that plaintiff's mild sleep

disturbances were probably not responsible for her symptoms.  AT 241.

Findings of this nature made by such consultants can provide substantial

evidence to support an ALJ's RFC findings.  *Barringer v. Comm'r of Soc.*

*Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) (Sharpe, J.).

I note that Dr. Gara's office records indicate a diagnosis of

fibromyalgia.[7]  To be sure, fibromyalgia has been recognized as a

potentially severe impairment that may support a claim of disability under

the Act.  *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003);

*Lisa*, 940 F.2d at 44-45.  Addressing the condition, the Seventh Circuit

has explained:

> Fibromyalgia . . . [is] a common, but elusive and mysterious
> disease, much like chronic fatigue syndrome, with which it
> shares a number of features.  Its cause or causes are
> unknown, there is no cure, and of greatest importance to
> disability law, its symptoms are entirely subjective.  There are
> no laboratory tests for the presence or severity of fibromyalgia.
> The principal symptoms are "pain all over," fatigue, disturbed

---

[7]   Fibromyalgia is described by a leading medical source as:

[a] syndrome of chronic pain of musculoskeletal origin but uncertain
cause.  The American College of Rheumatology has established
diagnostic criteria that include pain on both sides of the body, both above
and below the waist, as well as in an axial distribution (cervical, thoracic,
or lumbar spine or anterior chest); additionally there must be point
tenderness in at least 11 of 18 specified sites.

Stedmans Medical Dictionary (27th ed. 2000).  Fibromyalgia is also commonly referred
to as fibrositis.  *Green-Younger v. Barnhart*, 335 F.3d 99, 101 n.1 (2d Cir. 2003).

sleep, stiffness, and – the only symptom that discriminates
between it and other diseases of a rheumatic character –
multiple tender spots, more precisely 18 fixed locations on the
body (and the rule of thumb is that the patient must have at
least 11 of them to be diagnosed as having fibromyalgia) that
when pressed firmly cause the patient to flinch.  All these
symptoms are easy to fake, although few applicants for
disability benefits may yet be aware of the specific locations
that if palpated will cause the patient who really has
fibromyalgia to flinch. . . . Some people may have such a
severe case of fibromyalgia as to be totally disabled from
working, but most do not[.]

*Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996) (internal citations

omitted).

As may be gathered, by its very nature fibromyalgia is not always

readily susceptible to detection or verification through clinical testing or

other objective means.  For this reason, courts have found that the

unavailability of clinical tests alone is not a basis for an ALJ to reject a

physician's diagnosis of fibromyalgia on the ground that it is not supported

by objective clinical findings.  *See Younger-Barnhart*, 335 F.3d at 168;

*Cruz v. Apfel*, 97-CV-1170, 1998 U.S. Dist. LEXIS 23385, at *22-*23

(N.D.N.Y. Nov. 4, 1998) (DiBianco, M.J.) (citing *Lisa*, 940 F.2d at 44),

*adopted*, 1998 U.S. Dist. LEXIS 23384 (N.D.N.Y. Dec. 21, 1998).  As was

explained by the Second Circuit,

[i]n stark contrast to the unremitting pain of which fibrositis

> patients complain, physical examinations will usually yield
> normal results – a full range of motion, no joint swelling, as
> well as normal muscle strength and neurological reactions.
> There are no objective tests which can conclusively confirm
> the disease; rather, it is a process of diagnosis by exclusion
> and testing of certain "focal tender points" on the body for
> acute tenderness which is characteristic in fibrositis patients.

*Lisa*, 940 F.2d at 45 (quoting *Preston v. Secretary of Health & Human*

*Servs.*, 854 F.2d 815, 817-18 (6th Cir. 1988)).

The ALJ explicitly considered the possibility of fibromyalgia in

plaintiff's case.  As he noted, however, according to Dr. Waxeley's review

of the relevant records it does not appear that plaintiff exhibits any of the

the classic signs of fibromyalgia, and the physical criteria for fibromyalgia

and chronic fatigue syndrome have not been met.  AT 241-42.  One

principal symptom of fibromyalgia is tenderness in at least eleven of

eighteen fixed locations on the body.  *Coyle v. Apfel*, 66 F. Supp. 2d 368,

374-75 (N.D.N.Y. 1999).  Dr. Gara, however, reported finding tenderness

only on plaintiff's hip and shoulder girdle.  AT 231.  Moreover, outside of

references to her headache complaints, plaintiff's hearing testimony was

devoid of any reference to pain or tenderness.  AT 280-94.

The ALJ's RFC assessment is also supported by the findings of a

State agency medical consultant who, based upon review of plaintiff's

medical records, rendered a similar opinion.  With the exception of avoiding hazards, climbing, and occasional balancing, the state agency physician opined that plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations.  AT 243-50.  In sum, the exertional elements of the ALJ's RFC findings are in this case well supported by the medical and other evidence in the record.

### 2.   Mental Condition

As has been noted, the evidence in the record reveals that in addition to her various physical conditions, plaintiff has been diagnosed as suffering from depression.

When there is evidence of a mental impairment that allegedly prevents a claimant from working, the Commissioner must follow a special procedure at each level of administrative review.  *See* 20 C.F.R. §§ 404.1520a, 416.920a.  The Commissioner first records the pertinent signs, symptoms, findings, functional limitations, and effects of treatments contained in the record.  *Id.* §§ 404.1520a(b)(1), 416.920a(b)(1).  If a mental impairment is determined to exist, the Commissioner must next indicate whether certain medical findings which have been found especially relevant to the ability to work are present or absent.  *Id.* §§

404.1520a(b)(2), 416.920a(b)(2).  In doing so the Commissioner rates the degree of functional loss resulting from the impairment – on a scale ranging from no limitation to severe limitation, the latter of which is incompatible with the ability to do work-like functions – analyzing four specific factors, including 1) activities of daily living; 2) social functioning; 3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings.  *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3).

The Commissioner must then determine the severity of the mental impairment.  *Id.* §§ 404.1520a(d), 416.920a(d)(2).  Where the Commissioner rates the degree of limitation in the first three functional areas as "none" or "mild", and "none" in the fourth functional area, the Commissioner will generally conclude that claimant's impairment is not severe, unless the evidence indicates otherwise.  *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).  If, on the other hand, the Commissioner finds the claimant's medical impairment to be severe, she must determine whether it meets or equals a listed mental disorder.  *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2).  In the event the impairment is deemed severe, but does not meet or equal a listed mental disorder, the Commissioner next

analyzes the claimant's RFC, considering whether he or she is limited in the ability to carry out certain mental activities – such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting – to such a degree as to reduce his or her ability to do past relevant work and other work. *See* 20 C.F.R. §§ 404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c).

An ALJ is no longer required under the governing regulations to append a Psychiatric Review Technique Form ("PRTF") to his or her decision when addressing a case when a psychological impairment is implicated. 65 Fed. Reg. 50746-01 (Aug. 21, 2000), *available at* 2000 WL 1173632, at *50758. The ALJ is, however, nonetheless subject to the requirement that an analysis of whether a mental impairment exists be incorporated or in some way embodied within his or her decision when evidence of such an impairment is presented. 20 C.F.R. §§ 404.1520a.

To trigger these requirements a claimant bears the initial responsibility of providing medical evidence sufficient to indicate the potential existence of a mental impairment. *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991) (citing 20 C.F.R. §§ 404.1508, 404.1514). In this

case there are indications in some of plaintiff's medical records that she suffers from depression.  *See*, *e.g.*, AT 110, 254-67, 292.  Since this initial requirement is satisfied, it was incumbent upon the ALJ to make an analysis of the effects of that mental impairment upon the various areas referenced in the pertinent regulations.  In this instance the ALJ made the required analysis concluding that plaintiff's impairment only slightly limited her in the area of her social functioning, and presented no other impediment in the critical areas.  AT 16.  The court must determine whether these findings are supported by substantial evidence.

A psychiatric evaluation performed by Dr. Berry in August of 2003 revealed many normal findings.  Plaintiff was found to be alert, cooperative, and oriented, her speech was normal and smooth, and she was found to have average intelligence with her memory intact.  AT 254-55.  Dr. Berry also reported that plaintiff's insight and judgment were good and that there was no evidence of suicidal or homicidal ideations, delusions, preoccupations, obsessions, or compulsions.  *Id.*

Subsequent mental examinations of the plaintiff indicated many of the same normal findings.   AT 258, 262.  In a psychiatric progress note, dated November 3, 2003, Dr. Berry reported that plaintiff was still irritable,

but improving.  AT 261.  Significantly, plaintiff indicated in her testimony

that she was not then, nor had she ever, seen a psychologist or a

psychiatrist for her depression or anxiety.[8]

Based upon the foregoing I conclude that the ALJ's findings

regarding plaintiff's mental condition are supported by substantial

evidence.

### 3.   Treating Physician

In her testimony, plaintiff referred to Dr. Gara, an internist, as her

primary physician.  One could argue that Dr. Gara's opinions, which

included his assessment that plaintiff is totally disabled, were improperly

rejected by the ALJ because they were supported by objective or clinical

findings and consistent with the medical evidence in the record.

Moreover, the nature of fibromyalgia, as a disability whose symptoms are

largely subjective, makes it difficult for a treating physician to render a

diagnosis which is supported by the objective medical evidence

contemplated by the regulations.

Ordinarily, the opinion of a treating physician is entitled to

---

[8]   Despite his diagnosis of depression NOS, plaintiff testified that she was seeing Dr. Berry to address her sleep disorder, and not in his capacity as a psychologist.  AT 288, 292-93.

considerable deference, provided that it is supported by medically

acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence.[9]  *Veino*, 312 F.3d at 588;

*Barnett*, 13 F. Supp. 2d at 316.  Such opinions are not controlling,

however, if contrary to other substantial evidence in the record.  *Veino*,

312 F.3d at 588.  Where conflicts arise in the form of contradictory

medical evidence, their resolution is properly entrusted to the

Commissioner.  *Id.*

   In deciding what weight, if any, an ALJ should accord to medical

opinions, he or she may consider a variety of factors including "[t]he

duration of a patient-physician relationship, the reasoning accompanying

---

[9]   The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions
> from your treating sources . . . If we find that a
> treating source's opinion on the issue(s) of the
> nature and severity of your impairment(s) is
> well-supported by medically acceptable
> clinical and laboratory diagnostic techniques
> and is not inconsistent with the other
> substantial evidence in your case record, we
> will give it controlling weight.   When we do
> not give the treating source's opinion
> controlling weight, we apply [various factors]
> in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof[.]"  See *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (discussing 20 C.F.R. §§ 404.1527, 416.927).

When a treating physician's opinions are repudiated, the ALJ must provide reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Failure to apply the appropriate legal standards for considering a treating physician's opinions is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of his or her opinions.  *Johnson*, 817 F.2d at 985; *Barnett*, 13 F. Supp. 2d at 316-17.

The relevant records of Dr. Gara now before the court consist principally of an opinion of disability, a matter reserved to the Commissioner, *see* 20 C.F.R. § 404.1527(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999), and a raw diagnosis of fibromyalgia or chronic fatigue syndrome.  AT 212-40.  The mere fact that plaintiff might, according to her treating physician, suffer from fibromyalgia does not necessarily mean that she is disabled.  Like many other medical conditions fibromyalgia is one which may be, but is not necessarily, so limiting as to qualify as disabling under the Act.  *See Coyle*, 66 F.Supp.2d

at 376-77 (N.D.N.Y. 1999) (Hurd, J.).  When evaluating whether such a

condition is truly disabling, one must instead look to the symptoms,

including any claims of disabling pain, to determine disability in such a

case.  *See Green-Younger*, 335 F.3d at 108-09; *Coyle*, 66 F.Supp.2d at

376-77.

In his decision, ALJ Gibbons found that Dr. Gara failed to provide

any significant objective findings to support his diagnosis of fibromyalgia

or chronic fatigue syndrome.  AT 17.  The ALJ noted that Dr. Gara's office

notes merely listed plaintiff's problems and did not include any other

findings.  *Id.*  ALJ Gibbons further noted that there was no evidence of

trigger points in Dr. Gara's medical records, except for the tenderness

found in plaintiff's hip and shoulder girdle on one office visit.  *Id.*  It is also

significant that Dr. Gara did not complete an RFC assessment, setting

forth his specific findings regarding plaintiff's limitations.

As ALJ Gibbons noted, Dr. Gara's opinions are inconsistent with

other substantial evidence in the record.  Specifically, his opinions are

inconsistent with the many neurological examinations that had indicated

normal results, with Dr. Wakeley's opinion that plaintiff did not have the

classic symptoms of fibromyalgia and that the physical criteria for

fibromyalgia had not been met, and with the opinion of a non-examining

state agency physician that the claimant has no exertional limitations.  AT

17.

Notwithstanding the elusive nature of fibromyalgia and its causes,

the ALJ had adequate reason to reject the opinions of Dr. Gara based on

a lack of objective medical evidence to support his diagnosis and the

inconsistency of his opinions with the substantial evidence in the record.

### 4.    Subjective Pain Complaints

It could also be argued that in arriving at his conclusion the ALJ

improperly overlooked plaintiff's subjective testimony concerning her

limitations and pain complaints.

An ALJ must take into account subjective complaints of pain in

making the five step disability analysis.  20 C.F.R. §§ 404.1529(a), (d),

416.929(a), (d).  When examining the issue of pain, however, the ALJ is

not required to blindly accept the subjective testimony of a claimant.

*Marcus*, 615 F.2d at 27; *Martone*, 70 F. Supp. 2d at 151 (citing *Marcus*).

Rather, an ALJ retains the discretion to evaluate a claimant's subjective

testimony, including testimony concerning pain.  *See Mimms v. Heckler,*

750 F.2d 180, 185-86 (2d Cir. 1984).  In deciding how to exercise that

discretion the ALJ must consider a variety of factors which ordinarily would be relevant on the issue of credibility in any context, including the claimant's credibility, his or her motivation, and the medical evidence in the record. *See Sweatman v. Callahan*, No. 96-CV-1966, 1998 WL 59461, at *5 (N.D.N.Y. Feb. 11, 1998) (Pooler, D.J. and Smith, M.J.) (citing *Marcus*, 615 F.2d at 27-28)). In doing so, the ALJ must reach an independent judgment concerning the actual extent of pain suffered and its impact upon the claimant's ability to work. *Id.*

When such testimony is consistent with and supported by objective clinical evidence demonstrating that claimant has a medical impairment which one could reasonably anticipate would produce such pain, it is entitled to considerable weight.[10] *Barnett*, 13 F. Supp. 2d at 316; *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a). If the claimant's testimony concerning the intensity, persistence or functional limitations associated with his or her pain is not fully supported by clinical evidence, however, then the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and

---

[10] In the Act, Congress has specified that a claimant will not be viewed as disabled unless he or she supplies medical or other evidence establishing the existence of a medical impairment which would reasonably be expected to produce the pain or other symptoms alleged. 42 U.S.C. § 423(d)(5)(A).

intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

　　After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.  *Martone*, 70 F. Supp. 2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If such testimony is rejected, however, the ALJ must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 151 (citing *Brandon v. Bowen,* 666 F. Supp. 604, 608 (S.D.N.Y. 1987)).  Where the ALJ's findings are supported by substantial evidence, the decision to discount subjective testimony may not be disturbed on court review.  *Aponte v. Secretary, Dep't of Health & Human Servs. of U.S.,* 728 F.2d 588, 591 (2d Cir. 1984).

　　Fibromyalgia, like many other medical conditions, is one which may be, but is not necessarily, so limiting as to qualify as disabling under the

Act.  *See Coyle*, 66 F. Supp. 2d at 376-77.  In fibromyalgia cases, "the credibility of the claimant's testimony regarding her symptoms takes on 'substantially increased' significance in the ALJ's evaluation of the evidence," because physical examinations will usually yield normal results. *Id.* at 376 (citations omitted).

After careful consideration of plaintiff's testimony, the ALJ determined that her alleged symptoms were not of a degree of severity, intensity, frequency, or duration as to prevent her from performing her past relevant work.  The ALJ noted that even though plaintiff complained of chronic headaches since December of 1999, which required her to spend eighty percent of the day in bed, she admitted that she worked until July, 2001.  AT 18.  Plaintiff alleged a seizure disorder for which there was no medical documentation or diagnosis in the record by any of the numerous examining neurosurgeons.  *Id.*  Plaintiff testified that she vomits up to fifteen to seventeen times a day, yet has gained forty-five pounds in the last four years.  *Id.*  Plaintiff alleges that she suffers from asthma, a condition not well documented in the record, yet admits to still smoking a pack of cigarettes a day.  *Id.*  Moreover, while plaintiff testified that she has had a constant headache that has not gone away for five minutes

since December, 1999, medical evidence in the record indicates that her headaches improved with certain medications.  AT 163, 201.

Despite plaintiff's complaints of blurred vision, an eye examination revealed that her uncorrected visual acuity was 20/20-1 in both eyes, essentially normal.  AT 106.  Plaintiff has alleged problems with her memory and concentration, such as forgetting on one occasion that she was cooking until she smelled something burning.  AT 70.  Dr. Berry's records, however, indicate that at the time of his evaluations plaintiff's immediate, short, and long term memory were intact and not impaired.  AT 255, 258, 262, 266.  Additionally, there is medical evidence in the record which suggests findings that plaintiff may have overestimated and augmented her subjective pain complaints.  AT 199.

It may be, as plaintiff asserts, that she does suffer from some degree of discomfort as a result of her medical conditions.  The fact that she suffers from discomfort, however, does not automatically qualify her as disabled, since "disability requires more than mere inability to work without pain."  *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983).

Having found that the ALJ properly considered plaintiff's subjective complaints of symptoms and limitations, and determined them not to be

credible to the extent alleged, I recommend a finding that substantial evidence supports the ALJ's determination.

## IV.   SUMMARY AND RECOMMENDATION

The record in this case reveals that while cognizant of plaintiff's diagnosed condition of fibromyalgia as well as her depression, sleep disorder, and chronic headaches, the ALJ carefully parsed through the medical evidence in the record and properly concluded that she retains the RFC to perform her past relevant work.  In making his RFC assessment, the ALJ considered, but rejected, both plaintiff's subjective complaints and Dr. Gara's opinion that she is disabled, and the basis for those rejections is fully articulated and supported by the substantial evidence in the record.

Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability AFFIRMED, and plaintiff's complaint in this matter DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court within ten (10) days.  FAILURE TO SO

OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roland v. Racette*,

984 F.2d 85 (2d Cir. 1993).


Dated:      December 18, 2006
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

G:\socialsecurity\Keaysreprec.wpd